HENRY T. SCHUCHLER *vs.* ALEXANDER B. COOPER, Administrator of ROBERT COBURN DICKSON, deceased.

*Assumpsit—Care and Attention and Board—Statute of Limitations—Acknowledgment of Indebtedness—What May be Recovered.*

1.   The Court instructed the jury that under the evidence in the case the plaintiff, if entitled to recover at all, could only recover for the items in the bill of particulars occurring within three years before the commencement of the action; there not having been shown any such acknowledgment upon the part of the defendant as would prevent the bar of the statute of limitations.

2.   In ascertaining the value of services rendered, and board furnished, the jury should be governed by the price fixed by the parties, if any price was agreed upon and shown, but if no price was agreed upon their verdict should be for such sum as the services rendered and the board furnished were reasonably worth, as disclosed by the evidence.

3.   This case was taken to the Supreme Court upon writ of error, and was dismissed on the ground that the plaintiff had no standing in said Court, he having assigned all his interest in the verdict immediately after the same was obtained, but before judgment, and before the writ of error was taken.

(*March 1, 1904.*)

LORE, C. J., and PENNEWILL and BOYCE, J. J., sitting.

*William T. Lynam* and *J. Harvey Whiteman* for plaintiff.

*William S. Hilles* for defendant.

Superior Court, New Castle County, February Term, 1904.

ACTION OF ASSUMPSIT (No. 190, Sept. T., 1901) for care and attention and board furnished Robert Coburn Dickson, from 1892 to 1900.

At the trial testimony was adduced as to the time covered by the board furnished and services rendered to Robert Coburn

Dickson by the plaintiff, and the acknowledgment of indebtedness therefor by said Dickson, as follows :

*Louise Schuchler, Jr.,* testified on direct examination as follows :

*By Mr. Whiteman :*

Q. What relation are you to Henry Schuchler?

A. I am his daughter.

Q. Where do you now reside ?

A. At 1103 Clayton street in this city.

Q. With whom do you reside ?

A. Mr. H. W. Gause.

Q. You are employed in his household ?

A. Yes, sir.

Q. Where did you reside in June, 1892 ?

A. With my father on the Joe Morrow place.

Q. Was that in Christiana Hundred ?

A. Yes, sir.

Q. In this County ?

A. Yes, sir.

Q. And that is near Walnut Run School House?

A. Yes, sir.

Q. Did you attend that school?

A. Yes, sir.

Q. Did you know Mr. Robert C. Dickson in his lifetime ?

A. Yes, sir.

Q. How far did he reside from your home ?

A. It was not very far from the Morrow place.

Q. About how far, as near as you can tell ?

A. About a half mile.

Q. How old were you when you first knew him ?

A. About seven.

Q. How did you become acquainted with him ?

A. When we started to carry his meals, that is the way we first got acquainted with him.

Q. Who started to carry his meals?

A. My sister and I.

Q. Is your sister older than you?

A. She is two years younger than I.

Q. How far did you have to go when you first began carrying his meals?

A. When we first began carrying them we had to go about a half mile.

Q. How long did you continue to take his meals to him?

A. Eight years; from 1892 to 1900.

Q. How many times a day did you take his meals to him?

A. Three times a day.

Q. What meals did you take to him?

A. The best kind of meals.

Q. Who took care of Mr. Dickson, if you know?

A. My father.

Q. What care did he take of him?

A. He cleaned the house for him and swept the rooms for him and saw that his fires were fixed and that everything was all right before father left the place.

Q. What time would your father get away from there to go to his home?

A. Between ten and eleven o'clock sometimes and sometimes it would be half-past eleven. I know that because I used to wait for father at nights and go home with him.

Q. Did Mr. Dickson ever pay your father for this board furnished him?

A. No, sir.

Q. How do you know that?

A. Because I heard father ask him for the money and Mr. Dickson asked him if he could not wait until he could get the money.

Q. When did you hear that conversation?

A. I guess it was about a year before he died.

Q.  What else, if anything, did he say about paying your father for the board furnished?

A.  He said the farm was big enough to pay for the bill.

Q.  What did your father say to him about being paid for this board furnished?

A.  He said, " Mr. Dickson, could not you let me have the money for the bill?"   And Mr. Dickson said he did not have the money for the board bill.

Q.  Where did this conversation between your father and Mr. Dickson relative to his payment of this bill take place?

A.  In the dining room of Mr. Dickson's house.   I was in the kitchen.

Q.  Was the door open or closed?

A.  The door was open.

Q.  How far was the kitchen from the dining room?

A.  It was adjoining the dining room.   The kitchen adjoined the dining room.

Q.  Did you say it was a year before, or within a year of his death?

A.  It was a year before his death.

Q.  When did he die?

A.  He died in June, 1900.

*Louise Schuchler, Sr.*, testified upon the same point as follows:

*By Mr. Whiteman:*

Q.  You are the wife of Henry T. Schuchler, the plaintiff, are you not?

A.  Yes, sir.

Q.  Did you know Robert Coburn Dickson in his lifetime?

A.  Yes, sir; I knew him well.

Q.  How long did you know him?

A.  I knew him from 1892 until he died, on June 5th, 1900.

Q.  Where did you live during those eight years?

A.  The first two years we lived on the Morrow place, and

then  we  lived at the " Owls Nest " and then from there we moved to Susie Donohue's place.

Q.  Did you and your husband ever do anything for  Mr. Dickson ?

A.  We boarded him, and Mr. Schuchler looked after  him and took care of him.

Q.  Who prepared the food for him ?

A.  I did.

Q.  What would you prepare ?

A.  I prepared all kinds of vegetables that come on the table, and everything that the market brings.

Q.  Did you ever prepare any meats of any kinds for  him ?

A.  Yes, sir ; beef, leg of lamb and all kinds  of  meats.

Q.  Did you ever prepare any chicken ?

A.  Yes, sir ; he got chicken every day.

Q.  How many meals did you furnish him each day ?

A.  Three meals.

Q.  And this was during the time that you lived on the Morrow property, at the "Owls Nest " and on the Donohue  property ?

A.  Yes, sir.

Q.  Was  your  husband  ever  paid  for  that board furnished Mr. Dickson ?

A.  No, sir.

Q.  Did Mr. Dickson  ever say anything in your presence about paying your husband that bill ?

A.  Yes, sir ; he did.

Q.  What did he say ?

A.  My husband asked him about it, and he said had he not patience ; that he had plenty of money coming to him, and he ain't got it at the present time.   Then he said, " If  you don't get the money, the farm is big enough to pay you."

Q.  Did  he  say anything about paying him when he got the money ?

A.  He said he did not have it to spare.

Q.   What did Mr. Dickson say about paying your husband for this food that was provided for him?

A.   Well, he said that he would pay him ten dollars a week.

Q.   And when did he say he would pay it?

A.   He said when he got the money.

Q.   When was this conversation?

A.   That was about a year or two years before he died.

Q.   Where was he when he said this?

A.   He was in the dining room of Mr. Dickson's house.

Q.   When was the first time anything was said between your husband and Mr. Dickson as to how much board should be charged?

A.   Well, it was the first time, when Mr. Dickson asked my husband about whether he could board him.

Q.   What was said as to how much should be charged?

A.   He told my husband to make up the bill; how much the bill was.

Q.   What was the bill made out for?

A.   For his victuals and for the work.

Q.   How much money?

A.   Ten dollars a week.

Q.   Was that satisfactory to Mr. Dickson?

A.   Mr. Dickson said he was satisfied with that.

Q.   And you say that was the first week you began supplying him with food?

A.   Yes, sir.

(The witness further testified, in cross-examination, upon the same points, as follows):

*By Mr. Hilles:*

X.   About what year was it that your husband had this talk about the ten dollars a week that Mr. Dickson was going to pay for his board?

A.   It was in the fall.

X.   What year?

A. About two years, I think, before he died.

X. Was that the only talk that you ever overheard about it?

A. No, sir; I heard it many times.

X. Before that?

A. Before that.

X. I understood you to say, in answer to Mr. Whiteman's question, that when you went on the farm there was a talk about ten dollars a week. Is that right, or was I mistaken?

A. When we took Mr. Dickson to board the first week he told my husband to make up the bill, and he was satisfied with the bill which my husband made up for him at $10 a week.

X. When was that?

A. That was in the spring of the year of 1892.

X. In the spring of the year 1892 your husband made up a bill, did he, for $10 a week?

A. Yes, sir.

X. And he presented it to Mr. Dickson?

A. Yes, sir.

X. And did Mr. Dickson pay him?

A. No, sir.

X. Did he present a bill every week?

A. No, sir.

X. Did he ever present a bill to Mr. Dickson.

A. Yes, sir; he did.

X. When?

A. In the spring of the year, the first time when we started to board Mr. Dickson.

X. Was that the only one that he presented?

A. Yes, sir; the only one.

### DEFENDANT'S PRAYERS:

The defendant prayed the Court to charge the jury as follows:

1. That under the evidence in this case, the plaintiff, if entitled to recover anything in the opinion of the jury, can only

recover for the items in the bill of particulars occurring within three years before the commencement of this suit.

*Burton vs. Waples, 1 Houst., 260.*

2. In order to take the case out of the statute of limitations, the plaintiff must prove an unconditional acknowledgment of liability on the account, which is the basis of the suit.

3. That unless the jury shall believe from the evidence that there was an express contract to pay a certain amount, they can find for the plaintiff only nominal damages, as there is no proof of the value of the service rendered.

*153 Pa. St., 434.*

4. "Claims against a dead man's estate, which might have been made against himself, while living, are always subjects of just suspicion, and our books from *Graham vs. Graham, 34 Pa., 475, to Miller's Est., 136 Pa., 239 (249)*, are full of expressions by this Court of the necessity of strict requirement of proof and the firm control of juries in such cases. The present is no better than most of its class.

"Wages for domestic service are presumed to be paid at the periods customary at the time and in the neighborhood, and claims for such wages for unusual length of time, and especially those not made until after the claimant has left the service, must be supported by affirmative proof that they have not been paid. As said by Strong, J., speaking of the similar presumption of payment of a bond after the lapse of twenty years, the legal presumption shifts the burden of proof, and "after twenty years the creditor is bound to show by something more than his bond, that the debt has not been paid. *Reed vs. Reed, 46 Pa. 239.* The English rule in regard to wages has long been settled. It is founded on the habits and usages of the people, the solid foundation of all common law presumptions of fact. The same habits and usages obtain in this country, and the same rule was therefore adopted in *McConnell's*

*appeal, 97 Pa. 31,* and is now the settled law of the State: *Houck vs. Houck, 99 Pa. 552 ; Webb vs. Lees, 1 Adv. R. 677 (149 Pa. 13).*

"The presumption goes stronger as each period of payment goes by. In the nature of things it is less potent against a claim for two or three months' wages, than for two or three years'; and again its strength is increased or diminished by other circumstances that in the usual experience of life make payment more probable or explain the delay. And the evidence to sustain the claim must vary in the same ratio. As said by our late Brother Clark in *Gregory vs. Com., 121 Pa. 611,* 'the presumption will gather strength with each succeeding year, and the evidence to overthrow it must, of course, be correspondingly increased.' "

LORE, C. J., charging the jury:

Gentlemen of the jury :—In this action, Henry T. Schuchler, the plaintiff, seeks to recover from Alexander B. Cooper, administrator of Robert Coburn Dickson, deceased, the defendant, for personal services and for board, which he rendered and furnished to the deceased in his lifetime, and which are itemized in his bill of particulars as follows :

| | |
|---|---:|
| Board from June 10, 1892, to May 25, 1900, at $10.00 per week, ...... | $4120.00 |
| Nursing, May 25th to June 5, 1900, at $5.00 per day, ...... | 55.00 |
| Care and attention, cleaning up and waiting upon deceased, from June 19, 1892, to May 25, 1900, at 75c per day, ...... | 1463.00 |
| Probate, ...... | .15 |
| Aggregating, ...... | $5638.15 |

One of the pleas relied upon by the defendant is the statute of limitations. Under that plea the defendant claims that no recovery can be had for any parts of the items named in the bill of

particulars, which were furnished or rendered more than three years before the date of the commencement of this action, which was September 13, 1901. Running back three years from that date would bring you to September 13, 1898.

The statute of this State provides that no action shall be brought in cases like this, after the expiration of three years from the accruing of the cause of action.

Portions of the claim in this case appear upon the face of the bill of particulars to be barred by the statute.

We are unable to find in the evidence any acknowledgment of the part so claimed to be barred by the statute as a subsisting demand made either by the deceased in his lifetime, or by his administrator the defendant since his decease, which would remove this bar. We say to you, therefore, that in reaching your verdict, you are not to consider any part of the plaintiff's bill for services rendered or board furnished prior to September 13, 1898.

Should you be satisfied from the evidence that after September 13, 1898, and before the death of the defendant, which it is not disputed occurred June 5, 1900 ; the plaintiff rendered services or furnished board, or both, as claimed in his bill of particulars, for which he had not been paid, he would be entitled to your verdict covering that period of time. In ascertaining the value of such services or board, you should be governed by the price fixed by the parties, if any price was agreed upon and shown ; if no price was agreed upon, your verdict should be for such sum as the services rendered and board furnished were reasonably worth as disclosed by the evidence.

Verdict for plaintiff for $925.15

NOTE. The above case was taken up to the Supreme Court on a writ of error and at the June Term, 1904, thereof the writ of error was dismissed on motion of defendant's counsel, on the ground that the plaintiff Schuchler had no standing in said Court ; he having assigned all his interest in the verdict immediately after same was obtained, but before judgment, and before the writ of error was taken.